# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### January 18, 2012 Session

## STATE OF TENNESSEE v. CHARLES L. WILLIAMS

**Appeal from the Criminal Court for Davidson County**
**No. 2003-D-3000   Monte Watkins, Judge**

_____

### No. M2010-01451-CCA-R3-CD - Filed March 8, 2013

_____

Appellant, Charles L. Williams, was indicted in October of 2003 for one count of rape of a child and two counts of rape. In November of 2005, the case proceeded to trial. Appellant was convicted as charged and sentenced to an effective sentence of twenty-two years in incarceration. Appellant appealed the convictions and sentence. *See State v. Charles L. Williams*, No. M2005-00836-CCA-R3-CD, 2006 WL 3431920 (Tenn. Crim. App., at Nashville, Nov. 29, 2006) ("*Williams I*"). On appeal, this Court reversed the convictions and remanded for a new trial. *Id.* at *1. On remand, Appellant was again found guilty of rape of a child and two counts of rape. This time, the trial court sentenced Appellant to an effective sentence of seventeen years, merging the two convictions for rape with the conviction for rape of a child. Appellant appeals his convictions after retrial, arguing: (1) that the trial court should have dismissed the indictment with prejudice because the State committed violations of Rule 16 of the Tennessee Rules of Criminal Procedure and *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to provide audible videotapes of interviews with Appellant and the victim until three days into the second trial; (2) that the trial court failed to follow the mandate of this Court with respect to expert testimony; (3) that the trial court permitted improper testimony of experts; and (4) that the remedy for the trial court's errors is a dismissal of the indictment. After a review of the record and applicable authorities, we conclude that the State did not commit a *Brady* violation where the information in the videotapes was not material; Agent Johnson's testimony was not in contravention of this Court's opinion on direct appeal; and the expert testimony elicited at trial was based on information actually perceived by the expert in his examination of the evidence. Accordingly, the judgments of the trial court are affirmed.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed

JERRY L. SMITH, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and CAMILLE R. MCMULLEN, JJ., joined.

Mark C. Scruggs, Nashville, Tennessee, for the appellant, Charles L. Williams.

Robert E. Cooper, Jr., Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Brian Holmgren, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### *Factual Background*

In *Williams I*, this Court summarized the basic facts that led to Appellant's indictment as follows:

> The convictions in this case stem from an incident in which [Appellant] allegedly digitally penetrated the victim in the anus during the early morning hours of October 23, 2003, at the Nashville home of Ms. Latonya Sims (the victim's mother). [Appellant] arrived at Ms. Sims' home late in the evening of October 22nd, and the two engaged in consensual sex in the same bed in which Ms. Sims' four-year-old daughter (the "victim") was asleep. Upon concluding their sexual activities, [Appellant] remained in the same room with the sleeping child, and Ms. Sims went to an adjacent room. Moments later Ms. Sims heard her child say "ouch." She returned and found the victim in bed with [Appellant], who was clad only in his boxer shorts. Ms. Sims carried her child to the bathroom, where she discovered blood from an injury to the victim's buttocks area. After she was awakened, the victim stated that her "bootie hurt" and that [Appellant] had "stuck" his finger in her "bootie." The police were called, and [Appellant] was arrested.

> In October of 2003, [Appellant] was indicted by a Davidson County grand jury on three charges: rape of a child, *see* Tenn. Code Ann. § 39-13-522(a), and two counts of rape, *see id.* § 39-13-503(a).[FN1] In November of 2005, the Defendant received a jury trial.

> > FN1. It is undisputed that all three charges related to the same single incident. The two rape charges allege alternate theories; count two charged rape where the victim was "physically helpless," and count three charged rape "without . . . consent." *See* Tenn. Code Ann. § 39-13-503(a)(2) and (3).

2006 WL 3431920, at *1.

At the conclusion of the jury trial in *Williams I*, Appellant was convicted of all three charges. The trial court sentenced Appellant to an effective sentence of twenty-two years in incarceration. On appeal, Appellant challenged the following: (1) the admission of hearsay testimony from the victim; (2) the sufficiency of the evidence; (3) the admission of testimony of the DNA expert about the significance of the ratio of DNA discovered under Appellant's fingernails; (4) prosecutorial misconduct; (5) the jury instructions; (6) the failure of the trial court to merge the rape convictions into the child rape conviction. On appeal, this Court determined that:

> [T]he trial court erred by allowing certain speculative testimony by the State's DNA expert witness. We also have concluded that the prosecutor engaged in misconduct during closing argument. In addition, the two rape convictions should have been merged into the child rape conviction. We have determined that the cumulative effect of the trial errors deprived [Appellant] of a fair trial. Judge Welles also concludes that the trial court erred by giving erroneous jury instructions for the requisite mens rea.

*Id.* This Court determined that, standing alone, the trial court's error with respect to the admission of speculative expert testimony was harmless. *Id.* at *19. However, as a result of the cumulative errors, this Court reversed the convictions and remanded the matter for a new trial.

On retrial, the evidence at trial during the State's proof consisted of the following testimony. Ms. Sims testified that she was at home on the evening of October 21, 2003 with her daughter, her sister, her sister's four children, and her brother. Her daughter, the victim, was four years old at the time. Appellant came to visit around 11:00 p.m., staying for a few minutes before leaving. Appellant promised to come back later that evening.

Ms. Sims put her daughter to bed in the downstairs living room in a queen-size bed. The victim was wearing pants, panties, and a shirt. Ms. Sims stayed with her daughter until Appellant came back at around 12:30 or 12:45 a.m. Appellant was with a friend named "Leon," and they all visited with Ms. Sims's brother and sister in the upstairs portion of the apartment while the victim slept downstairs. At some point, Ms. Sims went down to bed. Appellant came downstairs to talk to Ms. Sims. After about thirty minutes of talking, the two engaged in sexual intercourse on the bed where the victim was sleeping. According to Ms. Sims, she and Appellant remained at the foot of the bed while they were having intercourse. They stopped only when Ms. Sims's brother walked into the room and interrupted their

activities. Appellant remained fully dressed during their sexual relations except "his pants were down around his ankles."

Appellant went upstairs to the bathroom to clean off; Ms. Sims went to the kitchen to cook some food for the next day. Appellant came back downstairs and sat on a couch in the living room in front of the bed. Ms. Sims walked into the living room and talked to Appellant for a few minutes before returning to the kitchen. At that time, Ms. Sims thought Appellant was going back upstairs to "check on Leon," so she continued to work in the kitchen for approximately the next fifteen minutes before hearing the victim cry out "ouch."

Ms. Sims walked into the living room to check on her daughter and discovered that the lights had been turned out. She turned on the lights and started looking for the victim. She could not find her amongst the blankets on the bed. The victim was located under a pile of blankets under Appellant, who was dressed only in his boxer shorts and socks. Ms. Sims stated that the victim's pants were "balled down" and "half off her behind." Knowing something was wrong, Ms. Sims grabbed the child and rushed upstairs to the bathroom where she closed the door. Appellant followed her upstairs.

In the bathroom, Ms. Sims pulled down her daughter's pants and "checked her vagina to see was there any tear, or rip or - had she been fondled or anything." Ms. Sims did not see that type of abuse. Then she turned the child over and saw blood. Ms. Sims "separated [the victim's] butt cheeks to check and . . . spotted the tear and the blood just started running."

Ms. Sims's sister Amanda came into the bathroom and both women tried to wake the sleeping child. Ms. Sims told her sister that Appellant had molested the child. When the child woke up she exclaimed that her "bootie hurt" and that "[Appellant] stuck his finger in [her] bootie."[1] Ms. Sims immediately confronted Appellant and called the police. Appellant left the apartment.

Appellant was arrested nearby and identified by Ms. Sims. The victim was taken almost immediately to the hospital, at around 6:21 a.m. on the morning of October 22, 2003.

Officer John Pepper of the Metropolitan Nashville Police Department responded to the call. When he arrived, the victim told him that Appellant "hurt my bootie." Officer Pepper admitted that his written report contained no mention of any statements from the

---

[1] On cross-examination, Amanda Sims admitted that at the first trial she never testified that she heard the victim say that Appellant stuck his finger in the victim's "bootie." Additionally, Amanda Sims admitted that she did not hear the child make the exclamation in the bathroom but rather when the police arrived at the home.

victim. Further, Officer Pepper did not include in his report any mention of the fact that he heard Amanda Sims claim that she overheard the victim making the statements. Officer Pepper testified that Ms. Sims did not inform him that she and Appellant had sex on the bed where the victim was sleeping prior to the incident.

Carla Giles, a licensed counselor with the Nashville Child Advocacy Center, conducted a forensic interview with the victim. During the interview, the victim denied that anyone touched her in the "breast, vaginal region, or buttocks." Ms. Giles noted that there was a videotape of the interview but that she was unaware of the whereabouts of the videotape.

The victim was examined by nurse practitioner Sue Ross around 7:30 or 8:00 a.m. that morning. The genital exam was "totally normal, unestrogenized, [with] no tears, nothing." However, an examination of the anal area revealed:

> [A] tear in the twelve o'clock position of her anal area, that was different than most that I see in children. Most of the time if I see anything, any sort of injury, to the anal area it's a fissure, which is just a crack in the skin, it's linear, and may or may not look acute. It's not uncommon for kids to have chronic looking fissures. This, on the other hand, looked acute, looked like it was very fresh. And instead of being just a linear cut, if you will, or tear in the skin, it was a tear that had intact skin going through the center of it.

She described an acute injury as one that looked like it had "fresh blood" on it and described the victim's injury as "very unusual." Ms. Ross testified that the injury pattern present in the victim was inconsistent with an injury like one would receive from the passage of a hard stool or diarrhea. According to Ms. Ross, those injuries would result in fissures or "straight line" "splits" in the skin of the anus. When asked to describe injuries associated with digital penetration, Ms. Ross stated that most of the time there was "no injury," but it was possible that there could be an injury, specifically if there "were something unusual about that particular person's finger, . . . [or] fingernail." The injuries she observed were consistent with the history she received from Ms. Sims prior to the examination. When the victim was reexamined on November 3, 2003, the area had not completely healed.

Detective Brett Gipson interviewed Appellant after he was detained. During the interview, Appellant admitted that he had sex with Ms. Sims while the victim was in the bed but denied putting "his finger inside [the victim's] butt." Appellant admitted that they could have rolled over on top of the victim while they were having sex. Detective Gipson recalled that Appellant had fingernails that were longer than "a man would normally keep his

fingernails." Appellant was asked to provide blood, fingernails, and fingernail scrapings for DNA analysis. Appellant consented.

Special Agent Chad Johnson of the Tennessee Bureau of Investigation ("TBI") received the buccal swabs, scrapings, and fingernail clippings from Appellant to analyze. He also received DNA samples from the victim.

Agent Johnson testified that when he analyzed the scraping from the fingernails on Appellant's right hand, he obtained a partial DNA profile consistent with a mixture of genetic material. He testified that "[t]he major contributor profile was consistent with . . . the victim and the subject. The minor contributor profile was from [an] unknown individual . . . ." On the left hand, the major contributor of the profile matched the victim. Agent Johnson was only able to obtain a partial profile of the minor target of the mixture from the left hand. They were consistent with Appellant and an unknown individual. When asked to explain "major" versus "minor" contributor, Agent Johnson explained "that the data revealed that one person[']s DNA was more present that the other person[']s. In this case the victim's profile was there in greater quantity than the subject's." Agent Johnson explained the victim was a major contributor for the samples that he collected from both Appellant's right and left hand.

On the third day of trial, the State provided the defense with a copy of the audio-visual recordings of the forensic interview of the victim as well as an audible copy of the first interview of Appellant. While the jury was not present, counsel for Appellant asked for a mistrial because he based his defense on the fact that "these tapes do not exist." Counsel for the State explained that the tapes were archived in the files of the police department after the first trial and were only discovered the night before they were given to counsel for Appellant. Counsel for the State was unaware how the tape of the victim's interview would prejudice Appellant because the essence of the tape was that the "child didn't make any disclosure." As to the tape of Appellant's interview, counsel for the State pointed out that Appellant's prior defense counsel was provided with a copy of the tape. Even though that tape turned out to be inaudible, counsel for Appellant was permitted to listen to the State's audible copy. Counsel for the State insisted that when counsel for Appellant requested the tapes "over a year ago" in the second trial they looked "with due diligence" and did not discover the tapes.

When the jury returned, Detective Robert Carrigan testified that in 2003, videotapes of interviews were kept on-site at Youth Services Division. At the end of each calendar year, the interviews were boxed up and submitted to the archives section. He discovered the existence of the tapes on the second day of the second trial. Counsel for Appellant moved for a mistrial. The trial court denied the request, and the tapes were played for the jury.

Appellant testified on his own behalf. He claimed that he had not seen the tape of his interview until it was played for the jury. However, he stated that he told the truth in the tape and that was the best evidence of the events that took place.

*Analysis*

*Alleged Brady Violation*

Appellant argues on appeal that the indictment should be dismissed because the State "withheld the videotaped interview of [the victim] and an audible videotape of [Appellant] until three days into" the second trial in violation of Rule 16 of the Tennessee Rules of Criminal Procedure and *Brady v. Maryland*, 373 U.S. 83 (1963). The State disagrees, arguing that even though the videotapes were not disclosed until the third day of trial, they were admitted into evidence and played for the jury. Additionally, the State points out that the tapes did not contradict any evidence admitted at trial or present any new evidence for the jury to consider. Finally, the State contends, Appellant has failed to show prejudice as a result of the late disclosure.

In *Brady*, the Supreme Court held that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." In order to establish a due process violation under *Brady*, four prerequisites must be met:

> 1. The defendant must have requested the information (unless the evidence is obviously exculpatory, in which case the State is bound to release the information, whether requested or not);
>
> 2. The State must have suppressed the information;
>
> 3. The information must have been favorable to the accused; and
>
> 4. The information must have been material.

*State v. Edgin*, 902 S.W.2d 387, 389 (Tenn. 1995). *Brady* does not require the prosecution "to disclose information that the accused already possesses or is able to obtain." *State v. Marshall*, 845 S.W.2d 228, 233 (Tenn. Crim. App. 1992). The burden of proving a *Brady* violation rests with the defendant, and the violation must be proven by a preponderance of the evidence. *Edgin*, 902 S.W.2d at 389.

This Court has stated that in order to establish a *Brady* violation, the information need not be admissible, only favorable to the defendant. *See State v. Spurlock*, 874 S.W.2d 602, 609 (Tenn. Crim. App. 1993). Favorable evidence includes evidence that "provides some significant aid to the defendant's case, whether it furnishes corroboration of the defendant's story, calls into question a material, although not indispensable, element of the prosecution's version of the events, or challenges the credibility of a key prosecution witness." *Johnson v. State*, 38 S.W.3d 52, 56-57 (Tenn. 2001) (quoting *Commonwealth v. Ellison*, 379 N.E.2d 560, 571 (Mass. 1978)). This Court will deem evidence material if a reasonable probability exists that the result of the proceeding would have been different had the evidence been disclosed. *See United States v. Bagley*, 473 U.S. 667, 682 (1985). A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." *Id.* at 682 (quoting *Strickland v. Washington*, 466 U.S. 668, 694 (1984)).

We have reviewed the tapes in question. Appellant argues that the videotape of the victim is exculpatory because she "never implicated anyone of touching her improperly" and that the videotape of his own interview is exculpatory because Appellant insists that he never touched the victim. While the videotapes are exculpatory in nature, we determine that they are not material to the defense of the case herein. The testimony elicited from Ms. Giles at trial prior to the discovery of the tapes indicated that the victim denied that anyone touched her in the "breast, vaginal or buttocks" region. The tapes heard by the jury, merely confirmed this testimony. Further, there was testimony introduced other than the videotaped interview of Appellant in which Appellant denied ever touching the victim, both from Appellant himself and officers that were with Appellant when he was arrested. There is no reasonable probability that the outcome of the trial would have been different had this evidence been disclosed prior to trial. Thus, Appellant has failed to show prejudice and is not entitled to relief.

As part of this argument Appellant insists that "the use of the audible videotaped interview of [Appellant] was not the prejudice. Instead, it was [counsel for the State's] cross-examination of [Appellant] in *Williams I* [used] to impeach him in *Williams II* which, in essence, forced [Appellant] to defend himself without the benefit of an audible videotape." We fail to understand this argument. At the first trial, Appellant took the stand and testified that he did not touch the victim inappropriately but that it was possible that he accidentally poked the victim. The videotape was not introduced. At the second trial, Appellant deferred to the statements that he made on the late-discovered videotape as to what happened on the night of the incident. Appellant was then cross-examined by counsel for the State about the inconsistencies between his testimony in the first trial in comparison to his statements on the videotape. Appellant explained at the second trial that "the [statements he made on the] tape rule[]" because it was made closer in proximity to the incident while his mind was fresh. The testimony he gave at the first trial was more removed in time from the incident. The jury in

the second trial was made aware of the fact that the tape was not in evidence during the first trial. We fail to see how this relates to a *Brady* violation when Appellant admits that the actual use of the videotape was not "prejudicial."

*Expert Testimony*

*A. DNA Testimony by Agent Johnson*

Next, Appellant argues that the trial court erred in allowing expert testimony "regarding the significance of the ratio of quantities of sample DNA material from [Appellant] and the victim in each specific sample." Specifically, Appellant complains that the trial court violated this Court's mandate with regard to expert testimony on retrial because the trial court allowed counsel to introduce the prohibited evidence for a second time. The State disagrees.

On direct appeal, with regard to the DNA testimony, this Court stated the following:

> Agent Johnson's testimony that the amount of the victim's DNA found in the samples taken from the Defendant's fingernails was significant because it represented more than "casual contact" was indeed speculative in that it was not based on "scientific, technical, or other specialized knowledge." Tenn. R. Evid. 702. Agent Johnson admitted that his conclusion that the evidence suggested more than casual contact was not based on any scientific study or even his opinion as an expert in the field of DNA analysis. Rather, he stated that he really did not know what the ratio meant or even if it had any significance at all. As such, this testimony did not "substantially assist the trier of fact to understand the evidence or to determine a fact in issue" as is required of expert testimony. Tenn. R. Evid. 702. Rather, this testimony served only to further confuse the jury on the already difficult to understand subject of DNA forensic evidence.

> Additionally, contrary to the State's argument on appeal, this statement by the DNA expert is not relevant to refute [Appellant's] testimony that he never had contact with the victim; [Appellant] did not deny having any contact with the victim. Furthermore, we disagree with the State's assertion that "[t]he jury was free to apply common sense as they considered the evidence [presented by the DNA expert] and the assistant district attorney was entitled to make arguments based on reasonable inferences that might be drawn from the evidence presented." To the contrary, the evidentiary exception of allowing expert opinion testimony is limited to only those situations where

-9-

"specialized knowledge" is needed, and even then expert opinion testimony is admissible only if it will "substantially assist" the jury in understanding the evidence. Accordingly, we find the admission of the DNA expert's speculative testimony was error. This error was, unfortunately, also compounded by the trial court's allowing the prosecution to make this issue a key component of its closing argument.

*Id.* at *19. This Court determined that, standing alone, the trial court's error with respect to the admission of speculative expert testimony was harmless.

On retrial, prior to the testimony from Agent Johnson, counsel for Appellant made a motion to limit Agent Johnson's testimony such that he would not be permitted to testify or give opinions about the amount of DNA that was found in the fingernail clippings and scrapings. Counsel for Appellant specifically objected to any testimony with regard to the "major" and "minor" contributors of DNA in each sample. The trial court held a jury-out hearing during which the State made an offer of proof as to the substance of Agent Johnson's testimony. At the conclusion of the jury-out hearing, the trial court informed counsel for the State that Agent Johnson could not "speculate as to the manner of contact" based on the amount of DNA in the sample, but the trial court stated that it would wait to see what Agent Johnson's testimony included before it made a ruling on the testimony from the expert on "major" versus "minor" contributors to the DNA sample. Counsel for Appellant made a standing objection to Agent Johnson's testimony.

The jury was called back in and Agent Johnson testified that he analyzed fingernail scraping, fingernail clippings, and swabs from Appellant's hands and compared them to buccal swabs of the victim and the victim's mother. When Agent Johnson analyzed the scraping from the fingernails on Appellant's right hand, he obtained a partial DNA profile consistent with a mixture of genetic material. He testified that "[t]he major contributor profile was consistent with . . . the victim and [Appellant]. The minor contributor profile was from [an] unknown individual . . . ." On the left hand, the major contributor of the DNA profile matched the victim's DNA. Agent Johnson was only able to obtain a partial profile of the minor target of the mixture from the left hand. It was consistent with Appellant and an unknown individual. When asked to explain "major" versus "minor" contributor, Agent Johnson explained "that the data revealed that one person[']s DNA was more present [in the sample] than the other person[']s. In this case the victim's profile was there in greater quantity than the subject's." Agent Johnson explained the victim was a major contributor for the samples that he collected from both Appellant's right and left hand.

-10-

The State then asked Agent Johnson to consider the following hypothetical:

[A]ssume that an individual with longer fingernails or protruding fingernails were to insert their finger into the anal opening of another human being. In doing that, do you have an opinion to a reasonable degree of scientific certainty in whether or not in engaging in that process that person might collect DNA from the person who's being penetrated either on their fingernails or underneath their fingernails?

Agent Johnson replied that he "would expect to find cells there [from the person being penetrated]." Agent Johnson further testified that he had dealt with other cases involving digital or anal penetration in which fingernail clippings or scraping had been utilized to test for DNA. Counsel for the State then asked Agent Johnson:

[I]f that same penetration had resulted in a tearing of the skin and potentially, even, bleeding from the victim would you expect that process would also, or could also, contribute to the transfer of DNA from the victim to the subject's fingernails or underneath their fingernails?

Agent Johnson replied in the affirmative. On cross-examination, counsel for Appellant questioned Agent Johnson about "major" versus "minor" contributors as follows:

These ratios that you have been talking about, you know, this minor versus major contributor, et cetera, et cetera; the number of cells that are there in order to get an accurate sample, or reading, or whatever, of DNA - - scientifically the ratio of the amounts of DNA materials related to specific persons found in a sample has nothing to do with the nature of the contact that led to those amounts being deposited in the location where the sample was taken from . . . . Is that true?

Agent Johnson replied in the affirmative. Counsel for Appellant also asked if it was true that the "ratio of the amounts of DNA materials related to specific persons found in a sample has nothing to do with the duration of the contact that led to those amounts being deposited in the location where the sample was taken from." Again, Agent Johnson replied in the affirmative.

On appeal, Appellant insists that because the trial court allowed Agent Johnson to testify about the DNA in terms of "major" and "minor" contributors, he essentially allowed counsel for the State to "argue that the ratios imply more than casual contact" in violation of the mandate of this Court on direct appeal. We disagree. As discussed above, Agent

-11-

Johnson testified that DNA was found on the fingernails of both hands of Appellant. Three DNA profiles were identified in the samples: Appellant, the victim, and an unknown person. The victim's profile was present in the sample in a larger amount than the other subjects. Agent Johnson was not asked by counsel for the State or Appellant to speculate as to the type of contact or degree of contact that would have resulted in the transfer of DNA from the victim to Appellant. Counsel for the State merely asked if cells containing DNA would be found on the fingernails of a person who penetrated another person's genital or anal region with their finger. Agent Johnson's testimony did not violate this Court's earlier opinion. To the contrary, he did not speculate on any scientific findings but rather testified about his own observations concerning the DNA material from Appellant's fingernails. Appellant is not entitled to relief with respect to this issue.

### B. Testimony by Ms. Ross and Agent Johnson

In a related argument, Appellant contends that the trial court improperly allowed the State to elicit opinion testimony based on experience rather than training and science from both Agent Johnson and Ms. Ross. Specifically, Appellant argues this testimony had no foundation in science and did not comply with *McDonnell v. CBX Transp., Inc.*, 955 S.W.2d 257 (Tenn. 1997). The State disagrees, insisting that the testimony of the experts was based on both their training and expertise and was used to "assist the trier of fact to understand the evidence or to determine a fact in issue" in compliance with Tennessee Rule of Evidence 702.

Rule 702 of the Tennessee Rules of Evidence governs the admissibility of expert testimony. It provides:

> If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise.

Tenn. R. Evid. 702.

Rule 703 of the Tennessee Rule of Evidence provides that:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence. The court shall disallow testimony

in the form of an opinion or inference if the underlying facts or data indicate lack of trustworthiness.

Determinations regarding the admissibility of expert testimony are left to the sound discretion of the trial court. *State v. Ballard*, 855 S.W.2d 557, 562 (Tenn. 1993). On appeal, our standard of review is whether the trial court abused its discretion by allowing the expert testimony. Before reversing the trial court's determination, we must determine that the record shows that the trial court "applied an incorrect legal standard, or reached a decision which is against logic or reasoning that caused an injustice to the party complaining." *State v. Shirley*, 6 S.W.3d 243, 247 (Tenn. 1999); *State v. Shuck*, 953 S.W.2d 662, 669 (Tenn. 1997).

Rule 703 of the Tennessee Rules of Evidence contemplates three possible sources from which an expert may base his/her opinion: (1) information actually perceived by the expert; (2) information made known to the expert by others; and (3) information reasonably relied upon by experts in the particular field. *See* Tenn. R. Evid. 703; *see also* Neil P. Cohen, et. al., *Tennessee Law of Evidence* §§ 7.03(3), 7.03(4), 7.03(5) (5th ed. 2005). In other words, Rule 703 contemplates that inherently reliable information is admissible to show the basis for an expert's opinion, even if the information would otherwise constitute inadmissible hearsay. *See* Tenn. R. Evid. 703. It is not uncommon for an expert witness's opinion to be based on facts or data that are not admissible into evidence but are reliable. *See* Neil P. Cohen et al., *Tennessee Law of Evidence* § 7.03(4).

At trial, Ms. Ross testified about her physical examination of the victim shortly after the incident. She explained the anatomy of the anus, including the "rugae" or wrinkles/folds in the anus that allow it to open and expand during a bowel movement. Ms. Ross also described the victim's injury as a "tear in the twelve o'clock position of her anal area, . . . different than most that I see in children." Ms. Ross described most injuries in children as "anal fissures" or "a crack in the skin, [that is] linear, and may or may not look acute." Ms. Ross described the victim's injury as acute and non-linear, "a tear that had intact skin going through the center of it."

Ms. Ross described the victim's injury as unusual because the "intact skin" in the injury indicated that it was not associated with "stooling," partly because there was no report of the victim's having a bowel movement in the hours preceding the examination and partly because of the type of injury. Ms. Ross testified as to possible causes for the victim's injury. She commented that in cases of digital penetration:

[M]ost of the time, [there is] no injury. Do I think it's still possible that this occurred? Oh sure. But it would be unusual. And if there were something

unusual about that particular person's finger, you know - more specifically, was there something about that person's fingernail, because to me it would be much more likely that this is a fingernail sort of injury, not something that was there because the area was stretched and then split.

Ms. Ross testified that her expert opinion was based on her training and experience.

Regarding the testimony of Agent Johnson, Appellant seems to suggest that the testimony should have been limited to a mere explanation of the DNA process and a comparison of the samples, similar to the argument that he made above wherein he asserted that Agent Johnson's testimony violated the mandate from this Court on direct appeal.

We conclude that in the case herein, the opinions given during the testimony of Ms. Ross and Agent Johnson were based on information actually perceived by the experts in their examination of the evidence. *See* Tenn. R. Evid. 703. Further, the testimony was based on their training and experience and given to "assist the trier of fact to understand the evidence or to determine a fact in issue." Tenn. R. Evid. 702. Appellant is not entitled to relief.

### *Dismissal of Indictment Due to Prosecutorial Misconduct*

Finally, Appellant argues that the "continued violation of the mandates and admonishments" of this Court by counsel for the State should result in a dismissal of the indictment. In other words, that prosecutorial misconduct is present in such amounts that a dismissal of the indictment is warranted. Appellant even cites to other opinions wherein the assistant district attorney in this case was admonished for overzealous actions. We disagree. Each of Appellant's claims relating to the prosecutor's use of evidence and the trial court's rulings has been discussed at length above. Appellant has failed to show that he is entitled to relief on the basis of his claims. Therefore, there was no "extraordinary misconduct engaged in by the prosecutor" that entitles Appellant to a dismissal of the indictment. Appellant is not entitled to relief.

### *Conclusion*

For the foregoing reasons, the judgment of the trial court is affirmed.

_____
JERRY L. SMITH, JUDGE